# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re: John W. Reichmeier,

      Debtor.

Case No. 18-21427-7

_____

Ilene J. Lashinsky,
United States Trustee,

      Plaintiff,

v.

      Adversary Proceeding
No. 18-06072

John W. Reichmeier,

      Defendant.

_____

### Memorandum in Support of United States Trustee's
### Motion for Summary Judgment
_____

In deciding the motion, the Court is presented with this issue:

> Section 727 of the Bankruptcy Code provides numerous
> grounds on which a discharge may be denied. Here, John
> W. Reichmeier failed, without justification, to keep
> adequate records of hundreds of thousands of dollars'
> worth of cryptocurrency transactions as well as his
> gambling; and failed adequately to explain the loss of
> cryptocurrency. Should he be denied a discharge under
> § 727(a)(3) and (a)(5)?

The answer is yes. The transaction histories from Reichmeier's

cryptocurrency investment activities are inscrutable; in his own

attorney's words, they "defy explanation." Reichmeier himself is unwilling to even try to explain them. And the records of his gambling—which he turned to in a desperate attempt to mitigate the hemorrhaging in his cryptocurrency investments—make it impossible to ascertain his gains or losses from wagering.

The opportunity to discharge debts and obtain a "fresh start" is reserved only to the "honest but unfortunate debtor."[1] Whether Reichmeier was a victim of misfortune or simply a speculator with poor judgment is debatable. But in no way did he conduct his financial affairs honestly or in good faith. His own testimony demonstrates that he defrauded three of his most significant cryptocurrency investors to prevent them from pulling out, even as he was withdrawing huge sums to continue living the high life.

There is no plausible controversy as to the facts demonstrating that Reichmeier should be denied a discharge under § 727(a)(3) and (a)(5), and the United States Trustee is entitled to judgment as a matter of law on both counts of its complaint.

---

[1] *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

## 1. Statement of Material Facts

### A. The defendant is financially sophisticated.

1. Reichmeier, 25, has a background in finance.[2]

2. While a student at Rockhurst University, Reichmeier took second place—and won a $7,500 prize—in DST Systems' Robert L. Gould Scholastic Award Contest with a paper about how disruptive technologies affect the financial services industry.[3]

3. Among other things, Reichmeier's prize-winning paper argued that transparency would be pivotal in financial services companies' attempts to win the trust of younger investors.[4]

4. Reichmeier contributed portions of his prize-winning paper to an article published in the *Journal of Advances in Economics and Finance*.[5]

---

[2] Deposition of Defendant John W. Reichmeier ("Depo."), attached as **Exhibit 1**, at 106:4–24.

[3] *Id.* at 34:12–35:7, 40:18–42:7; Gould Scholastic Award paper, attached as **Exhibit 2**.

[4] Depo. at 43:15–25.

[5] *Id.* at 45:3–18; Brian D. Fitzpatrick, John Reichmeier & Jacob Dowell, Back to the Future: The Landscape of the Financial Services Industry 2020 and Beyond, J. Advances Econ. & Fin., Vol. 2, No. 1 (Feb. 2017), attached as **Exhibit 3**.

3

5.     In 2016, Reichmeier graduated from Rockhurst with a bachelor's degree in business administration and emphases in finance and accounting.[6]

6.     Reichmeier had a final grade-point average of 3.95 and graduated *summa cum laude*.[7]

7.     After graduation, Reichmeier began working at the Kansas City Series of Lockton Companies as an associate account manager specializing in commercial insurance for the construction industry.[8]

8.     In 2017, Reichmeier obtained the Associate in Risk Management and Associate in Underwriting designations from the Insurance Institutes for America.[9]

9.     Reichmeier is financially sophisticated.[10]

10.   Reichmeier is technologically sophisticated.[11]

---

[6] *Id.* at 10:3–16.

[7] *Id.* at 12:8–15.

[8] *Id.* at 12:16–22, 16:24–17:2.

[9] *Id.* at 35:11–36:16.

[10] *Id.* at 38:22–24.

[11] *Id.* at 31:23–32:1.

## B. As Reichmeier's cryptocurrency investments soar, other people ask him to take over their investments.

11. In or about April 2017, Reichmeier started investing in cryptocurrency and trading on cryptocurrency exchanges online.[12]

12. To get started in the cryptocurrency markets, Reichmeier took out a loan of $8,000 from Lending Club, a decentralized, peer-to-peer lending network.[13]

13. Over the next several months, the value of cryptocurrency skyrocketed, with Bitcoin alone reaching nearly $20,000 per coin.[14]

14. As the value of Reichmeier's cryptocurrency investments shot up, Reichmeier also began managing cryptocurrency loaned or transferred to him by others. As he testified at his deposition: "They all had their own accounts and at first we were kind of just like in a group chat trading together, but I was having more success than them, so they decided to transfer it to me."[15]

---

[12] *Id.* at 50:17–51:5.

[13] *Id.* at 44:8–15, 69:20–70:5, 112:2–16.

[14] *Id.* at 50:19–51:5.

[15] *Id.* at 50:19–51:5, 120:2–10.

15.  By December 2017, Reichmeier was managing more than

$85,000 in cryptocurrency transferred to him by relatives, friends, co-

workers, and other acquaintances:[16]

      a.  His father, Jack Reichmeier;[17]

      b.  His mother, Melissa Reichmeier;[18]

      c.  Quinn Damon, a family friend and co-worker at the Lockton Companies;[19]

      d.  Danny Callahan, a friend who worked at Lockton;[20]

      e.  Clint Hocker, a Lockton co-worker;[21]

      f.  Austin Hannifan, a friend from high school;[22]

      g.  Jackson Haney, a friend from high school;[23]

      h.  Alex Berhorst, a Lockton co-worker;[24]

      i.  Ryan Kearns, a former neighborhood acquaintance;[25]

      j.  Matt McAuliffe, a friend from high school;[26]

---

[16] *Id.*; *see also* e-mail from John Reichmeier to Jackson Haney with attachment titled "Crypto Returns 12/18/2017," attached as **Exhibit 4**.

[17] Depo. at 11:14–18, 116:4–117:1; *see* Ex. 4.

[18] Depo. at 88:9–20, 117:5–6; *see* Ex. 4.

[19] Depo. at 117:7–17; *see* Ex. 4.

[20] Depo. at 117:18–21, 118:1–5; *see* Ex. 4.

[21] Depo. at 117:22–25, 118:6–10; *see* Ex. 4.

[22] Depo. at 118:11–20; *see* Ex. 4.

[23] Depo. at 10:19–22, 118:21–22; *see* Ex. 4.

[24] Depo. at 118:23–119:3; *see* Ex. 4.

[25] Depo. at 11:2–4, 119:4–5; *see* Ex. 4.

[26] Depo. at 119:6–9; *see* Ex. 4.

k. Katie Warren, Reichmeier's girlfriend;[27] and

l. Rob Penniston, a Lockton co-worker and former high-school classmate.[28]

16. Reichmeier's cryptocurrency—both the amounts he acquired in his own name and the amounts transferred to him—were commingled and spread across multiple exchanges: Coinbase, Cryptopia, Bittrex, Gemini, and GDAX.[29]

17. Furthermore, in any given exchange or platform, Reichmeier would invest in several types of cryptocurrency: Bitcoin, Litecoin, Ethereum, and Bitcoin Cash.[30]

18. Reichmeier used a spreadsheet to track, on a percentage basis, each investor's proportional share of the total pool of cryptocurrency that Reichmeier was managing. But he did not create a new or separate file each time he updated it.[31]

---

[27] Depo. at 119:10–13; *see* Ex. 4.

[28] Depo. at 119:14–23; *see* Ex. 4.

[29] Depo. at 65:2–21, 122:20–123:5, 129:8–10, 148:17–23, 149:6–20, 151:14–20; 229:3–20.

[30] *Id.* at 149:12–20.

[31] E-mail from Paul Hentzen, attorney for John Reichmeier, to Christopher T. Borniger and Bradley McCormack, with attached spreadsheet (April 1, 2019), attached as **Exhibit 5**; Depo. at 229:8–230:12.

19. In early 2018, Reichmeier entered into written agreements memorializing Kearns's and Haney's cryptocurrency loans—at the time, $230,000 from Kearns and $50,000 from Haney—to Reichmeier. Under those agreements, Kearns and Haney also agreed to loan additional undefined sums of cryptocurrency to Reichmeier to manage and invest.[32]

20. At around the same time, Reichmeier entered into a virtually identical contractual arrangement with Augustine "Gus" Hanger, another friend from high school, who had already loaned $400,000 in cryptocurrency.[33]

21. The agreements provided that the amounts loaned would be treated as principal, that Reichmeier would pay back 95% to 98% of profits as interest, and that Reichmeier would be liable only for losses to the principal balance.[34]

---

[32] E-mail from Ryan Kearns to John Reichmeier with loan agreement (Feb. 6, 2018), attached as **Exhibit 6**; e-mail from John Reichmeier to Jackson Haney with loan agreement (Feb. 19, 2018), attached as **Exhibit 7**.

[33] Depo. at 10:19–24; e-mail from John Reichmeier to Gus Hanger with loan agreement (Feb. 9, 2018), attached as **Exhibit 8**.

[34] *See* Ex. 6, Ex. 7, Ex. 8.

22.  Reichmeier also provided spreadsheets to Kearns, Haney, and Hanger depicting the value of their cryptocurrency investments and the amount of gains in those investments.[35]

23.  In March, Reichmeier left his job at Lockton to focus on cryptocurrency trading full-time.[36]

24.  Reichmeier later began managing $50,000 in cryptocurrency loaned to him by an uncle, Dennis Huber. They did not sign any contract to memorialize the arrangement.[37]

25.  Neither did Reichmeier have a written agreement with any investors other than Kearns, Haney, and Hanger.[38]

---

[35] *See* Ex. 4; *see also* e-mail from John Reichmeier to Gus Hanger with spreadsheet (March 16, 2018), attached as **Exhibit 9**; e-mail from John Reichmeier to Ryan Kearns with spreadsheet (March 16, 2018), attached as **Exhibit 10**; e-mail from John Reichmeier to Jackson Haney with spreadsheet (April 23, 2018), attached as **Exhibit 11**; e-mail from John Reichmeier to Ryan Kearns with spreadsheet (April 23, 2018), attached as **Exhibit 12**; e-mail from John Reichmeier to Jackson Haney with spreadsheet (May 17, 2018), attached as **Exhibit 13**.

[36] Depo. at 13:7–17.

[37] *Id.* at 24:25–25:10, 114:13–21.

[38] *Id.* at 121:14–22.

Case 18-06072    Doc# 25    Filed 04/26/19    Page 9 of 39

**C. As the market enters a freefall and clients begin cashing out, Reichmeier obscures their losses.**

26. By mid-March 2018, the value of cryptocurrency had begun to decline substantially.[39]

27. By late April, according to Reichmeier, "things started getting bad," and the cryptocurrency investments had suffered significant losses.[40]

28. Around this time, four of the investors whose cryptocurrency Reichmeier managed began cashing out or withdrawing funds as follows:

    a. Quinn Damon, $6,000, on March 12, 2018;[41]

    b. Melissa Reichmeier, $10,000, on or about April 2;[42]

    c. Mikey Geist (or Mr. Geist's brother), $1,800, on April 18;[43] and

    d. Kearns, who cashed out $200,000 in increments over time.[44]

---

[39] *Id.* at 125:10–126:16.

[40] *Id.* at 137:21–22, 138:6–10.

[41] *Id.* at 228:22–229:11.

[42] *Id.* at 238:17–23.

[43] *Id.* at 237:23–238:16.

[44] *Id.* at 85:23–86:2, 86:10–20, 154:4–7.

29.  Ultimately, every other investor whose cryptocurrency Reichmeier managed lost the entirety of its investment.[45]

30.  On April 23, Reichmeier e-mailed Jackson Haney and attached a spreadsheet purporting to depict the total values and total percentage returns in the cryptocurrency investments by Haney as well as by "Joe," an associate of Haney's whom Reichmeier cannot identify.[46]

31.  The spreadsheet purported to show that Haney's contributions—which had surpassed $100,000 by that point—had earned $86,592 in profits, for an 83% return, and that Joe's contributions of roughly $1,800 had earned $484.64 in profits, for a 26% return.[47]

32.  In reality, the state of Haney's and Joe's investments was worse, and Reichmeier had not updated his calculations to reflect the losses to those investments.[48]

---

[45] *See id.* at 120:4–121:24.

[46] Ex. 11; Depo. at 136:12–137:14.

[47] Ex. 11.

[48] Depo. at 137:15–22.

33.  Reichmeier admits he knew the listed profits and returns were false when he provided the spreadsheet to Haney on April 23.[49]

34.  Reichmeier admits he intended for Haney and Joe to rely on those false representations so that they would not withdraw their investments: "I think I just figured, if I kept making it look like we were doing well, they wouldn't pull it out, so then I could buy time for the market to recover."[50]

35.  In April and May, Kearns began cashing out of his cryptocurrency investments in increments so that he could pay back a small-business loan.[51]

36.  On April 23, Reichmeier e-mailed Kearns with a spreadsheet purporting to show the gains in Kearns' cryptocurrency investments.[52]

_____

[49] Depo. at 138:6–17.

[50] *Id.* at 138:21–139:9.

[51] *Id.* at 85:23–86:2, 86:10–20.

[52] Ex. 12.

37.  The text of the e-mail stated: "Here is your updated spreadsheet. We have had a solid past couple weeks with the bullish movement finally."[53]

38.  The spreadsheet purported to show that Kearns' cryptocurrency loans—$225,000 by that point—had earned $479,595 in profit to date, for a total return of 213%.[54]

39.  In reality, those calculations were inflated.[55]

40.  Reichmeier admits he knew his representations in the e-mail and in the spreadsheet were false when he sent them to Kearns on April 23.[56]

41.  Reichmeier admits he intended for Kearns to rely on those false representations so that Kearns "would quit pulling the money out."[57]

---

[53] *Id.*; Depo. at 139:10–17.

[54] Ex. 12; Depo. at 140:15–17.

[55] Depo. at 140:18–141:3.

[56] *Id.* at 140:18–141:20, 141:24–142:8.

[57] *Id.* at 141:8–20.

Case 18-06072   Doc# 25   Filed 04/26/19   Page 13 of 39

42. By May, the cryptocurrency investments Reichmeier was managing had suffered significant losses, and Reichmeier was "panicked" and desperate.[58]

43. In an attempt to recover his losses, Reichmeier began investing in more volatile forms of cryptocurrency.[59]

44. Reichmeier also began gambling several thousands of dollars, most of it in cryptocurrency, on a Chinese sports-betting website, Bovada, as well as gambling smaller amounts in cash at casinos.[60]

45. On May 17, 2018, Reichmeier e-mailed what he represented as another updated spreadsheet to Haney.[61]

46. The spreadsheet purported to show that Haney's profits were down to $81,220, for a 55% return, and that the profits attributable to to "Joe" were down slightly to $430.97, for a 23% return.[62]

---

[58] *Id.* at 51:18–52:6, 140:18–23, 147:11–22, 243:21–23.

[59] *Id.* at 51:18–52:6, 147:11–22.

[60] *Id.* at 52:14–53:4, 93:3–22, 109:12–21, 167:18–23; *see also* Bovada Deposit and Withdrawal History, attached as **Exhibit 14**.

[61] Ex. 13. Although the tables on the spreadsheet were dated April 29, 2018, Reichmeier acknowledged at deposition that he intended to date them May 17. Depo. at 142:9–143:5.

[62] Ex. 13.

47.  Reichmeier admits he inflated those numbers.[63]

48.  Reichmeier admits he knew his representations in the spreadsheet were false when he sent the spreadsheet to Haney on May 17.[64]

49.  Reichmeier admits he intended for Haney and Joe to rely on those false representations so that they would not cash out of their investments.[65]

50.  By May 31, 2018, the cryptocurrency market had declined precipitously enough—about 85 percent since December 2017—that the cryptocurrency investments that Reichmeier was managing were mostly gone.[66]

51.  On May 31, after Haney and Hanger told Reichmeier that they needed to cash out to pay taxes for their business, Reichmeier confessed to them that "the money wasn't there."[67]

---

[63] Depo. at 143:6–17.

[64] *Id.* at 143:6–144:2.

[65] *Id.* at 143:18 –144:2.

[66] *Id.* at 145:24–146:18.

[67] *Id.* at 146:19–147:22.

52.  Haney and Hanger then sued Reichmeier in Missouri state court on claims including fraud, embezzlement, and breach of contract.[68]

53.  Before filing for bankruptcy, Reichmeier signed consent judgments admitting liability on those claims.[69]

**D.  In the months leading up to his financial collapse, Reichmeier liquidates large sums of cryptocurrency to spend on himself.**

54.  Beginning in December 2017, Reichmeier liquidated cryptocurrency from his accounts several times to cover personal expenses.[70]

55.  At his deposition, Reichmeier testified about several cryptocurrency withdrawals that ended up as cash deposits in his Bank of America account, most of which he used on personal expenses:[71]

---

[68] *See id.* at 90:11–91:23.

[69] *See id.* at 91:24–92:2.

[70] *See id.* at 210:5–211:19.

[71] Attached as **Exhibit 15** are redacted copies of Reichmeier's Bank of America account statements from December 22, 2017, to July 19, 2018—shortly after Reichmeier filed for bankruptcy.

a. $613.87 and $580.32 on December 22, 2017;[72]

b. $1,100 on January 2, 2018;[73]

c. $4,000 on January 16;[74]

d. $2,600 on January 29;[75]

e. $1,014.89 on February 2;[76]

f. $1,002.62 on February 6;[77]

g. $10,933.97 on February 20;[78]

h. $5,165.43 on February 28;[79]

i. Three deposits of $9,000 each ($27,000 total) on March 12;[80]

j. $7,010.42 on March 13;[81]

k. $4,500 on March 27;[82]

l. $3,000 on April 3;[83]

m. $3,000 on April 17;[84]

---

[72] Ex. 15 at 1; Depo. at 210:8–19.

[73] Ex. 15 at 1; Depo. at 210:20–211:2.

[74] Ex. 15 at 1; Depo. at 211:10–23.

[75] Ex. 15 at 11; Depo. at 214:23–215:15.

[76] Ex. 15 at 11; Depo. at 216:1–6.

[77] Ex. 15 at 11; Depo. at 216:7–11.

[78] Ex. 15 at 21; Depo. at 222:10–223:6.

[79] Ex. 15 at 21; Depo. at 223:7–11.

[80] Ex. 15 at 21; Depo. at 223:12–18.

[81] Ex. 15 at 22; Depo. at 223:19–224:3.

[82] Ex. 15 at 33; Depo. at 231:1–5.

[83] Ex. 15 at 33; Depo. at 231:6–8.

[84] Ex. 15 at 33; Depo. at 231:23–232:6.

n. $5,000 on April 23;[85]

o. $5,900 on May 2;[86]

p. $2,624.06 on June 4;[87]

q. $500.69 on June 19, representing the liquidation of what was left in Reichmeier's dwindled cryptocurrency accounts.[88]

56. Among the personal expenses Reichmeier was paying during this time period were:

a. Lasik surgery;[89]

b. Clothing for himself and his girlfriend;[90]

c. Multiple dinners and drinks for himself, his girlfriend, groups of friends, and others at upscale restaurants and bars;[91]

d. A down payment on a car;[92]

e. Purchases at head shops;[93]

f. Hotel rooms and vacations for himself and his girlfriend;[94]

---

[85] Ex. 15 at 43; Depo. at 240:2–7.

[86] Ex. 15 at 43; Depo. at 240:8–14.

[87] Ex. 15 at 51; Depo. at 248:13–249:10.

[88] Ex. 15 at 51; Depo. at 249:25–250:5.

[89] Depo. at 215:4–15.

[90] *Id.* at 217:20–219:8, 225:3–9, 227:12–16.

[91] *Id.* at 219:9–15, 224:10–225:2, 232:7–18.

[92] *Id.* at 222:10–223:6.

[93] *Id.* at 225:18–226:12.

[94] *Id.* at 226:24–227:11, 236:11–23, 241:8–20.

18

g. Large payments toward balances on multiple credit cards;[95]

h. The balance of the 2017 loan from Lending Club that Reichmeier used to begin investing in cryptocurrency;[96] and

i. Gambling at casinos.[97]

## E. Reichmeier files for bankruptcy.

57. On July 13, 2018, Reichmeier filed his chapter 7 petition.[98]

58. On the schedules to his petition, Reichmeier listed total assets of $18,772.29 and total liabilities of $993,402.21.[99]

59. Reichmeier asserted in the petition that his debts are not primarily consumer debts.[100]

60. The bulk of Reichmeier's unsecured debt is owed to four of the cryptocurrency investors:

a. Gus Hanger, $618,000;[101]

b. Dennis Huber, $50,000;[102]

---

[95] *Id.* at 227:17–22, 237:9–22, 243:24–245:22, 251:16–22, 252:15–21.

[96] *Id.* at 228:8–11.

[97] *Id.* at 236:24–237:8, 241:21–242:2.

[98] Chapter 7 Case No. 18-21427 (Bankr. D. Kan.), Doc. #1 ("Petition").

[99] *Id.* at 26.

[100] *Id.*

[101] *Id.* at 17 ln. 4.2.

[102] *Id.* at 17 ln. 4.3.

c.   Jackson Haney, $230,456;[103] and

d.   Ryan Kearns, $30,000.[104]

61.  Reichmeier asserted in the petition that each of those four unsecured claims is disputed.[105]

62.  At his deposition, however, Reichmeier testified that he does not dispute those debts.[106]

63.  Reichmeier did not list any claims of other cryptocurrency investors on his schedules.[107]

**F.   Reichmeier's records do not detail his losses.**

**i.   There is no accounting for the cryptocurrency losses.**

64.  At his deposition, Reichmeier insisted that he never liquidated other persons' cryptocurrency to obtain money for his own personal use.[108]

---

[103] *Id.* at 18 ln. 4.5.

[104] *Id.* at 18 ln. 4.7.

[105] *Id.* at 17 ln. 4.2, 4.3, 18 ln. 4.5, 4.7.

[106] Depo. at 71:11–73:4.

[107] *See generally* Petition at 16–19.

[108] Depo. at 135:15–20, 215:16–25.

65. Instead, according to his testimony, whenever he cashed out some of his cryptocurrency, he would revise the proportional-share spreadsheet to reduce his ownership percentage.[109]

66. Reichmeier last updated his proportional-share spreadsheet in or about mid-April 2018; there is no document chronicling any fluctuations in any investor's share from that time until Reichmeier filed for bankruptcy on July 11.[110]

67. The transaction histories for the various cryptocurrency exchanges that Reichmeier used do not quantify profits, losses, or any changes to the account balances.[111]

68. To calculate losses, according to Reichmeier's deposition testimony, would require examining each of the thousands of transactions and matching them to the price of that particular form of cryptocurrency at the time.[112]

---

[109] *Id.* at 229:21–230:12.

[110] Ex. 5.

[111] Depo. at 154:20–155:14. *See also* Coinbase trade history, attached as **Exhibit 16**; Coinbase wallet transaction history, attached as **Exhibit 17**; Cryptopia trade history, attached as **Exhibit 18**; Bittrex trade history, attached as **Exhibit 19**; Gemini trade history, attached as **Exhibit 20**; GDAX trade history, attached as **Exhibit 21**.

[112] Depo. at 155:15–156:2.

69.  That accounting "would take a very long time."[113]

70.  Reichmeier has not engaged any expert to do an accounting for him.[114]

71.  Reichmeier believes he could do it, but he hasn't done it yet, and he has no intention to do so.[115]

72.  And to delineate each investor's share of the loss would require additional labor. As Reichmeier testified:

> All the funds are commingled, so – I guess you could take the amount that every person put in and that's their total amount, so each person has a percentage, and then just give them that percentage of the loss. . . . That's the only way I think I would know how to do it.[116]

73.  Later, he testified: "They're all blended together, so it's hard to differentiate."[117]

74.  Reichmeier has no documents other than the transaction histories that could potentially be used to trace the losses. As he testified:

---

[113] *Id.* at 160:12–25.

[114] *Id.* at 157:7–12.

[115] *Id.* at 216:19–217:11.

[116] *Id.* at 161:5–13.

[117] *Id.* at 266:22–267:6.

Q:   So you simply can't account for it?

A:   I mean, I can, because there's – the balances in the accounts are empty. I gave them everything that was left, so by virtue it's – it's been lost.

Q:   But you've got nothing else, just based on the fact that you know you gave them this much and it's all gone?

A:   Aside from these pages, yes.[118]

75.   After Reichmeier filed for bankruptcy, and in response to an inquiry from the United States Trustee's office, Reichmeier's attorney wrote in an e-mail on August 16, 2018, that "the records relating to the cryptocurrency trading are voluminous and defy explanation." She added:

> I sat down with Mr. Reichmeier today. The records do not provide us with any on-going balances so that we could tell what was in his account on any one day. All the records show are transactions (buy, sell) of percentages of cryptocurrency without any information as to the value. I am attaching a sample of one account. As you can see, it doesn't tell us what amount he had in that company on any given day.[119]

---

[118] *Id.* at 157:13–21.

[119] E-mail from Erlene Krigel to Stacy Kingsland, Steve Rebein, and Jordan Sickman (Aug. 16, 2018), attached as **Exhibit 22**.

### ii. Reichmeier has no documentation to detail wins or losses from gambling.

76. In discovery, Reichmeier produced a document prepared at his request by Bovada, the Chinese sports-betting website.[120]

77. The document lists dozens of deposits between April 1 and May 30, 2018—many of them in the thousands of dollars, and either in the form of Bitcoin or credit-card charges—and one withdrawal of $9,500 in Bitcoin on May 6, 2018.[121]

78. The document does not list the amounts of gains or losses from Reichmeier's wagers on Bovada.[122]

79. In the months leading up to bankruptcy, Reichmeier also gambled occasionally at Argosy Casino and Hollywood Casino, mostly on two table games: blackjack and craps.[123]

---

[120] Ex. 14; Depo. at 166:8–19.

[121] Ex. 14.

[122] *See id.*; Depo. at 168:3–18, 169:13–14.

[123] *Id.* at 163:14–21, 164:2–6, 164:17–22.

80.  In the Statement of Financial Affairs accompanying the petition, Reichmeier listed losses from online gambling but made no mention of losses sustained at casinos.[124]

81.  The only documents Reichmeier possesses reflecting his casino gambling are:

    a.  A spreadsheet he prepared for the chapter 7 trustee, Steve Rebein, chronicling gambling expenditures in the 90 days before bankruptcy;[125] and

    b.  The Bank of America account statements, which Reichmeier used to prepare the spreadsheet.[126]

82.  Those documents only reflect Reichmeier's ATM withdrawals at casinos and not gains or losses from casino gambling.[127]

83.  Reichmeier has no other documents that could potentially be used to trace his losses from gambling.[128]

---

[124] Petition, Doc. #1 at 32.

[125] Depo. at 163:4–21; *see* spreadsheet of casino expenditures, attached as **Exhibit 23**.

[126] Depo. at 164:23–165:15.

[127] *Id.* at 164:23–166:5.

[128] *Id.* at 163:18–164:1, 164:7–16, 164:23–166:5.

## 2. Argument and Authorities

### A. Summary judgment standard

Summary judgment is an important procedure "designed to secure the just, speedy, and inexpensive determination of every action."[129] A court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.[130] When analyzing a summary judgment motion, a court draws all reasonable inferences in favor of the nonmoving party.[131] An issue is genuine if there is sufficient evidence on each side for a rational trier of fact to resolve the issue either way.[132] A fact is material if it is essential to the proper disposition of a claim under applicable law.[133]

---

[129] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

[130] Fed. R. Civ. P. 56(a), applicable in bankruptcy courts under Fed. R. Bankr. P. 7056.

[131] *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 34 (10th Cir. 2013).

[132] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

[133] *Id.*

26

The moving party bears the initial burden of demonstrating—by reference to pleadings, depositions, answers to interrogatories, admissions, or affidavits—the absence of genuine issues of material fact.[134] If the moving party meets its initial burden, the nonmoving party cannot prevail by relying solely on its pleadings.[135] Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.[136]

Furthermore, under the local rules of this district, all material facts set forth in the movant's statement of material facts will be deemed admitted for the purpose of summary judgment unless specifically controverted in the opposing party's statement.[137] And if the responding party cannot truthfully admit or deny the factual matter asserted, the response must state in detail the reasons why.[138]

---

[134] *Celotex*, 477 U.S. at 323.

[135] *United States v. Dawes*, 344 F. Supp. 2d 715, 717–18 (D. Kan. 2004) (citing *Anderson*, 477 U.S. at 256).

[136] *Id.*

[137] D. Kan. R. 56.1(a); D. Kan. LBR 7056.1(a).

[138] D. Kan. R. 56.1(e); D. Kan. LBR 7056.1(e).

27

**B. The United States Trustee is entitled to summary judgment on Counts I and II of its complaint to deny discharge.**

The Bankruptcy Code enumerates a dozen specific conditions that authorize a court to deny a chapter 7 debtor's discharge.[139] The plaintiff bears the burden of proving a ground for denial of discharge,[140] and it must prove each element by a preponderance of the evidence.[141]

In this case, there is abundant evidence to support summary judgment on the United States Trustee's claims to deny discharge.

**i. Under § 727(a)(3), Reichmeier has failed to maintain adequate records.**

Under 11 U.S.C. § 727(a)(3), denial of discharge is warranted if

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case.[142]

---

[139] 11 U.S.C. § 727(a).

[140] Fed. R. Bankr. P. 4005.

[141] *Holley Performance Prods. v. Coppaken* (*In re Coppaken*), 572 B.R. 284, 302 (Bankr. D. Kan. 2017) (citing *First Nat'l Bank of Gordon v. Serafini* (*In re Serafini*), 938 F.2d 1156, 1156–57 (10th Cir. 1991)).

[142] 11 U.S.C. 727(a)(3).

The use of the words "any recorded information" and "documents and papers" in § 727(a)(3) means that if the debtor engages in one of the prohibited acts as to *any* recorded information—not merely books and records, but documents and electronic information from which financial condition or business transactions might be ascertained—then the debtor may be denied a discharge under § 727(a)(3).[143]

Moreover, although issues surrounding the denial of a debtor's discharge should ordinarily be viewed in a light most favorable to the debtor, "this generalization should be qualified by noting that the interests protected by section 727 are those of creditors and that the debtor is required to take such steps as ordinary fair dealing and common caution dictate to enable creditors to learn what the debtor did with his estate."[144] If the facts disclose an apparent breach of the debtor's duty to creditors to keep and preserve proper books or

---

[143] 6 <u>Collier on Bankruptcy</u> ¶ 727.03[1] (16th ed. 2018).

[144] *Solis v. Asif*, 455 B.R. 768, 790–91 (Bankr. D. Kan. 2011) (citing 6 <u>Collier on Bankruptcy</u> ¶ 727.03[1]).

records and the debtor fails to establish facts and circumstances to justify the lack of records, a discharge should be denied.[145]

To prevail on a § 727(a)(3) claim, a plaintiff must prove two elements by a preponderance of the evidence: First, the debtor failed to maintain and preserve adequate records; and, second, the failure made it impossible to ascertain the debtor's financial condition and material business transactions.[146] The plaintiff need not prove whether the debtor intended to conceal its financial condition.[147] Rather than attempting to divine intent, courts instead objectively measure the adequacy of a debtor's financial records against the type of books and records kept by a reasonably prudent debtor with the same occupation, financial structure, education, and experience.[148] Financially sophisticated debtors such as businesspersons are held to a higher level of accountability in recordkeeping.[149]

---

[145] *Id.* at 791 (citing 6 <u>Collier on Bankruptcy</u> ¶ 727.03[1]).

[146] *Id.* at 790 (citing *Gullickson v. Brown* (*In re Brown*), 103 F.3d 1290, 1295 (10th Cir. 1997)).

[147] *Id.* (citing *Meridian Bank v. Alten*, 958 F.2d 1226, 1234 (3d Cir. 1992).

[148] *In re Wynn*, 205 B.R. 97, 101 (Bankr. N.D. Ohio 1997).

[149] 6 <u>Collier on Bankruptcy</u> ¶727.03[3][b] (citing *Harrington v. Simmons* (*In re Simmons*), 810 F.3d 852 (1st Cir. 2016); *Meridian Bank v. Alten*, 958 F.2d at 1226).

A motion for summary judgment is especially suitable for objections to discharge under § 727(a)(3); a debtor defending against such an objection is not "invariably entitled to a full-dress trial" when summary judgment can establish that the records are inadequate.[150]

And here, that is precisely the case: Reichmeier's cryptocurrency transaction histories may be voluminous, but they are hardly adequate. The fact that multiples investors' cryptocurrencies were commingled across multiple exchanges underscores that conclusion.[151] Nowhere in the hundreds of pages that Reichmeier has produced is any information from which a reasonably intelligent person—let alone a financially sophisticated one such as Reichmeier—could determine, without engaging in a herculean accounting exercise, the value of any one of several investors' cryptocurrency in any one of several cryptocurrency accounts at any given time.[152]

---

[150] *In re Mathern*, 137 B.R. 311, 317 (Bankr. D. Minn. 1992).

[151] *See* Statement of Material Facts, *supra*, ¶¶ 16–17.

[152] *See id.* ¶¶ 68–75.

To his credit, Reichmeier kept track of each individual's portion of the cryptocurrency pool using a spreadsheet, but he stopped updating that proportional-share spreadsheet weeks before all the cryptocurrency was finally gone.[153] And he did not separately maintain any prior versions of that spreadsheet.[154] At best, then, Reichmeier can point only to a snapshot in time, which is useless when trying to bring any perspective to a byzantine series of hyper-technical transactions. Worse, by his own admission, Reichmeier began falsifying the numbers in the individualized spreadsheets that he provided to Haney and Kearns.[155] For someone with such intelligence and financial savvy, then, Reichmeier falls well short of any reasonable standard for recordkeeping.

Similarly, Reichmeier's gambling records are of no help in calculating his gambling wins and losses. The documents produced from Bovada, the Chinese sports-betting website, reflect only deposits

---

[153] Ex. 5.

[154] *Id.*

[155] Statement of Material Facts, *supra*, ¶¶ 30–41, 45–49.

and withdrawals.[156] And Reichmeier has nothing documenting the outcomes of any of his wagers at the Argosy and Hollywood casinos— no receipts, no ledgers, no diaries, nothing.[157] The lack of gambling records further frustrates any meaningful inquiry into the disappearance of assets.

There is no genuine issue of material fact, then, as to the adequacy of Reichmeier's records of his financial condition. The burden then shifts to Reichmeier to produce sufficient evidence to create a genuine issue of material fact indicating that his failures in recordkeeping were justified under the circumstances. Yet Reichmeier cannot seriously justify these failures, particularly in light of his academic achievements;[158] his education in fundamental principles of business, finance, and accounting;[159] his experience in the financial-services industry, including his professional credentials in risk management and underwriting;[160] and his decision, however

---

[156] *Id.* ¶ 77; Ex. 14.

[157] Statement of Material Facts, *supra*, ¶¶ 81–83; Ex. 23.

[158] Statement of Material Facts, *supra*, ¶¶ 2–6.

[159] *Id.* ¶ 5.

[160] *Id.* ¶¶ 7–8.

ill-fated, to quit his regular job and devote all his time to handling cryptocurrency investments.[161] Any justification would also be undermined by his admittedly fraudulent activity in reporting fudged numbers to his most substantial investors.[162] This Court should enter summary judgment on the United States Trustee's claim under § 727(a)(3) to deny Reichmeier a discharge.

### ii. Reichmeier has failed to satisfactorily explain his loss of assets.

Under § 727(a)(5), a discharge will be denied when the debtor "has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."[163] This ground for denial of discharge is broad enough to include any unexplained disappearance or shortage of assets.[164] As with a claim under § 727(a)(3), proof of intent is not required.[165]

---

[161] *Id.* ¶ 23.

[162] *Id.* ¶¶ 30–41, 45–49

[163] 11 U.S.C. § 727(a)(5).

[164] 6 <u>Collier on Bankruptcy</u> ¶ 727.08 (citing *Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616 (11th Cir. 1984); *Nof v. Gannon* (*In re Gannon*), 173 B.R. 313, 317 (Bankr. S.D.N.Y. 1994); *Steinberg v. Reagan* (*In re Reagan*), 13 B.R. 588 (Bankr. E.D. Tenn. 1981)).

[165] *Id.*; *May v. Shepherd* (*In re Shepherd*), Case No. 04-41627, Adv. No. 04-7090, 2005 Bankr. LEXIS 1941, at *9 (Bankr. D. Kan. Oct. 7, 2005) (citing *In re Ridley*,

To prevail on a § 727(a)(5) claim, a plaintiff bears the initial burden of showing that the debtor—at a time not remote to the filing of the bankruptcy—had assets that would have belonged to the bankruptcy estate but did not possess those assets as of the petition date.[166] Once the plaintiff has introduced some evidence that the substantial assets of the debtor have disappeared or that the debtor has engaged in unusual transactions, the burden shifts to the debtor, who must satisfactorily explain what happened.[167] The rationale is simple: The debtor is usually in the best position to reconstruct past dealings, and it may not hide behind Rule 4005 to avoid doing so.[168]

Whether the debtor's explanation is satisfactory is a question left to the court's discretion.[169] One renowned commentator has opined that the debtor probably must explain the losses or deficiencies in a way that convinces the court of good faith and businesslike

---

115 B.R. 731, 737 (Bankr. D. Mass. 1990)).

[166] *In re Shepherd*, 2005 Bankr. LEXIS 1941, at *7–8 (citing *In re Straub*, 192 B.R. 522, 525 Bankr. N.D. 1996)).

[167] 6 <u>Collier on Bankruptcy</u> ¶ 727.08 (citing *In re Chalik*, 748 F.2d at 616 (11th Cir. 1984); *First Federated Life Ins. Co. v. Martin* (*In re Martin*), 698 F.2d 883 (7th Cir. 1983); *Bahr v. Nett* (*In re Nett*), 70 B.R. 868 (Bankr. W.D. Wis. 1987)).

[168] *In re Asif*, 455 B.R. at 795 (citing 6 <u>Collier on Bankruptcy</u> ¶ 727.08).

[169] *Olson v. Potter* (*In re Potter*), 88 B.R. 843, 849 (Bankr. N.D. Ill. 1988).

conduct.[170] The explanation must consist of more than a vague, indefinite, and uncorroborated hodgepodge of financial transactions.[171]

Here, within just a few months of filing for bankruptcy, Reichmeier had nearly a million dollars' worth of cryptocurrency in his account.[172] In short order, it was gone. Scrambling to cover up his losses, Reichmeier resorted to gambling on a Chinese sports-betting website and in person at casinos. Reichmeier cannot dispute those facts, so the United States Trustee has easily met its initial burden.

Accordingly, the burden shifts to him to identify a genuine issue of material fact as to whether he can satisfactorily explain the disappearance of cryptocurrency and the further dissipation of assets through gambling. Yet at his deposition, the only explanation that Reichmeier offered is that the cryptocurrency market tanked and that, in a panic, he resorted to gambling. Counting on games of chance to cover up one's misdeeds is hardly evidence of good faith or

---

[170] *Id.*

[171] *Id.*; *In re Shepherd*, 2005 Bankr. LEXIS 1941, at *8 (citing *Matter of D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996)).

[172] Statement of Material Facts, *supra*, ¶¶ 19, 21, 31, 38, 46, 58, 60.

businesslike conduct. Neither is knowingly providing false information to investors intending that they rely on it to remain invested, while at the same time taking huge withdrawals to fund an indulgent lifestyle.

Just as damning is Reichmeier's refusal to even attempt to trace his cryptocurrency losses with the slightest bit of detail when he's in the best position to do so. Reichmeier's creditors—and this Court— are left to the futile task of trying to interpret hundreds of pages of transaction histories that read like reams of raw code. That is precisely the type of "vague, indefinite, and uncorroborated hodgepodge" that does not pass muster.

Reichmeier has not just given an unsatisfactory explanation of his losses, but effectively no explanation at all. Accordingly, ample cause exists under § 727(a)(5) to deny Reichmeier a discharge.

3.  **Conclusion**

A discharge in bankruptcy is a privilege, not a right, and Reichmeier's dubious conduct in this case is one of several reasons to withhold that privilege. The records of Reichmeier's cryptocurrency investments and gambling are incomprehensible, incomplete, or

37

intended to mislead; they are totally inadequate to satisfy his creditors' interest in tracing his activity, and with no justification for a person of his financial acumen. Reichmeier cannot—or will not—satisfactorily explain his losses, let alone convince a trier of fact that he conducted his affairs in good faith and in a businesslike manner. The material facts undergirding the complaint to deny discharge under § 727(a)(3) and (a)(5) are not subject to any genuine dispute. This Court should therefore grant the motion and enter judgment on those claims in the United States Trustee's favor.

ILENE J. LASHINSKY,
UNITED STATES TRUSTEE

By  *s/ Christopher T. Borniger*
Christopher T. Borniger, No. 24692
Trial Attorney
301 N. Main St., Suite 1150
Wichita, KS 67202
316-269-6216 (phone)
316-269-6182 (fax)
Christopher.T.Borniger@usdoj.gov

38

## CERTIFICATE OF SERVICE

I certify that on April 26, 2019, a true and correct copy of this **Memorandum in Support of Motion for Summary Judgment** was electronically filed with the Court using the CM/ECF system, which sent notification to all parties of interest participating in this case through the CM/ECF system.

Further, I certify that a copy of this **Memorandum** was sent via U.S. Mail, first class, postage prepaid and properly addressed to the following:

John W. Reichmeier
8405 E. Hampden Ave., Apt. 22P
Denver, CO 80231

*s/ Christopher T. Borniger*
Christopher T. Borniger