**SO ORDERED.**

**SIGNED this 15th day of April, 2020.**



_Dale L. Somers_
Dale L. Somers
United States Chief Bankruptcy Judge

Designated for online use but not print publication
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

In re:

John W. Reichmeier,

                  Debtor.

Ilene J. Lashinsky,
United States Trustee,

                  Plaintiff,

v.

John W. Reichmeier,

                  Defendant.

Case No. 18-21427-7

Adversary No. 18-6072

**Memorandum Opinion and Order Denying the
U.S. Trustee's Motion for Summary Judgment**

    Although Debtor John Reichmeier is only twenty five years old, he has

had a tumultuous few years. He graduated from college, with honors, and

started a new job. He began trading in cryptocurrency and had immediate

success; so much so, that he left his employment, and friends, colleagues, and

family members began having him manage their own cryptocurrency funds. But then the bottom fell out. The cryptocurrency market tanked, and Debtor lost not only all of his own money, but all the money of his friends and colleagues as well. He engaged in gambling to try and recoup the losses and continued to spend money to maintain his new lifestyle at its peak. Once the truth came out, Debtor ultimately signed consent judgments in state court civil suits against him for hundreds of thousands of dollars. Debtor has now turned to bankruptcy.

The U.S. Trustee has opposed Debtor's ability to receive a discharge, filing a complaint against him alleging claims under both 11 U.S.C. §§ 727(a)(3) and (a)(5).[1] The U.S. Trustee moves for summary judgment,[2] arguing that the uncontroverted facts show that Debtor failed to maintain records from which his financial condition could be ascertained and failed to satisfactorily explain his loss of assets. The Court concludes that the U.S. Trustee has not satisfied his burden of proof to show that the uncontroverted facts establish the § 727(a)(3) and the § 727(a)(5) claims and denies the motion for summary judgment.

---

[1] All future references to Title 11 of the United States Code will be to section number only. Debtor appears by Paul Hentzen and Erlene Krigel. The U.S. Trustee appears by Christopher Borniger.

[2] Doc. 24 (motion for summary judgment); Doc. 25 (memorandum in support).

## I. Findings of Fact, Based on Uncontroverted Facts

Debtor attended Rockhurst University and graduated *summa cum laude* in 2016 with a bachelor's degree in business administration (emphasis in finance and accounting), and a final grade point average of 3.95. After graduating, Debtor worked as an account manager for an insurance company, specializing in commercial insurance. In 2017, Debtor obtained risk management and underwriting designations from an insurance accrediting association and considered himself "pretty financially sophisticated" and "tech savvy."

In April 2017, Debtor began investing in cryptocurrency and trading on cryptocurrency exchanges online. To get started in the cryptocurrency markets, Debtor took out an $8000 loan from Lending Club, a decentralized, peer-to-peer lending network. Over the next several months, the value of cryptocurrency skyrocketed. As the value of Debtor's cryptocurrency investments shot up, Debtor also began managing cryptocurrency transferred to him by others. By December 2017, Debtor was managing more than $85,000 in cryptocurrency transferred to him by relatives, friends, coworkers, and other acquaintances.[3]

---

[3] These people included: Jack Reichmeier, Debtor's father; Melissa Reichmeier, Debtor's mother; Quinn Damon, a family friend and Debtor's coworker; Danny Callahan, a friend and coworker; Clint Hocker, a coworker; Austin Hannifan, a friend from high school; Jackson Haney, a friend from high school; Alex

3

In early 2018, Debtor and two of his friends—Ryan Kearns and Jackson Haney—entered into written agreements characterizing Kearns's and Haney's transfers of their cryptocurrency accounts to Debtor as loans to Debtor (at the time, $230,000 from Kearns and $50,000 from Haney).[4] According to the documents, Kearns and Haney also agreed to "loan" additional undefined sums of cryptocurrency to Debtor to manage and invest. At about the same time, Debtor entered into a virtually identical written agreement with Augustine Hanger, a friend from high school, who had already transferred $400,000 in cryptocurrency to Debtor. The agreements stated that the amounts transferred would be treated as principal, that Debtor would pay back 95% to 98% of profits as interest, and that Debtor would be liable only for losses to the principal balance.

In March 2018, Debtor left his job to focus entirely on cryptocurrency trading. Shortly thereafter, Debtor's uncle, Dennis Huber, gave Debtor a $50,000 check for Debtor to invest in cryptocurrency for him. Debtor and Huber did not sign any contract to memorialize their arrangement. In fact,

---

Berhorst, a coworker; Ryan Kearns, a former neighborhood acquaintance; Matt McAuliffe, a friend from high school; Katie Warren, Debtor's girlfriend; and Rob Penniston, a coworker and former high school classmate.

[4] Debtor attempts to controvert this and the related facts by calling the written agreement an illegal investment contract under *S.E.C. v. W.J. Howey*, 328 U.S. 293 (1946). Debtor contends the documents are void and unenforceable. But the U.S. Trustee is not attempting to draw conclusions from the written agreements; merely stating that they existed.

other than with Kearns, Haney, and Hanger, Debtor did not have a written agreement with anyone whose cryptocurrency he managed.

Debtor's cryptocurrency, both the amounts Debtor acquired in his own name and the amounts transferred to him, were commingled and spread across multiple exchanges: Coinbase, Cryptopia, Bittrex, Gemini, and GDAX. In addition, in any given exchange or platform, Debtor would invest in multiple types of currency: Bitcoin, Litecoin, Ethereum, and Bitcoin Cash. Debtor created a spreadsheet to track, on a percentage basis, each investor's proportional share of the total pool of cryptocurrency that he was managing. The spreadsheet was updated each time anyone withdrew crypto currency, but Debtor did not save or print out historical snapshots of the proportionate share spreadsheet. The record contains an undated example showing total value of $1,689,027 allocated to 17 individuals.[5]

By mid-March 2018, the value of cryptocurrency began to decline substantially. By late-April 2018, Debtor's cryptocurrency investments had suffered significant losses. Around this time, four of the investors whose cryptocurrency Debtor managed began cashing out or withdrawing funds: on March 12, 2018, Quinn Damon withdrew $6000; on April 2, 2018, Melissa Reichmeier withdrew $10,000; on April 18, 2018, Mikey Geist (or his brother)

---

[5] Doc. 25, Exh. 5. All future references to exhibits attached to Docket Number 25 will be to the exhibit number only.

withdrew $1800; and Kearns withdrew $200,000 in increments over time.[6]

It is undisputed that at this point, Debtor began purposefully deceiving the group he was trading for by sending emails containing inflated reports of profits. For example, on April 23, 2018, Debtor emailed Haney and attached a small spreadsheet purporting to depict the total values and total percentage returns in the cryptocurrency investments by Haney.[7] The spreadsheet purported to show that Haney's contributions—which had surpassed $100,000 by that point—had earned $86,592 in profits, for an 83% return. In reality, the value of Haney's investments and the profits were inflated. Debtor knew the profits were false. He intended for Haney, and the other investors to whom he sent similar emails, to rely on the false representations so they would not withdraw their investments, thinking he could buy time for the market to recover.

In April 2018, in an attempt to recoup the loss in value of the cryptocurrency accounts, Debtor began gambling on Bovada, a Chinese sports-betting website. According to a deposit history supplied by Bovada,[8] between April 1 and May 30, Debtor transferred $127,653.38, mostly in the

---

[6] Ultimately, every other investor whose cryptocurrency Debtor managed lost the entirety of his or her investment.

[7] The following scenario concerning Haney and his investments was also carried out with a man named "Joe," but Debtor does not know Joe's last name.

[8] Exh. 14.

form of bitcoin, to Bovada. The only withdrawal was $9,500 on May 6, 2018. In addition, Debtor occasionally engaged in recreational gambling at local casinos.

By May 2018, in the face of significant losses, Debtor became panicked and desperate. In an attempt to recover his losses, Debtor began investing in more volatile forms of cryptocurrency. On May 17, 2018, Debtor emailed what he represented as another updated spreadsheet to Haney. The spreadsheet purported to show that Haney's profits were down to $81,220, for a 55% return but Debtor admits he inflated those numbers as well. Debtor also admits that he knew his representations were false when he sent the spreadsheet to Haney, and that he intended for Haney to rely on those false numbers so he would not cash out his investment.

By May 31, 2019, the cryptocurrency market had declined precipitously enough—about 85% since December 2017—that the cryptocurrency investments that Debtor was managing were mostly gone. On May 31, both Haney and Hanger told Debtor that they needed to cash out to pay taxes for their business. At that point, Debtor finally confessed to them that the money was gone. What followed was state court lawsuits by both Haney and Hanger against Debtor, alleging claims of fraud, embezzlement, and breach of contract. Debtor did not enter an appearance in those state court lawsuits

and did not contest the litigation in any way. Rather, Debtor signed consent judgments in both cases, admitting that he owed the money on the claims stated.[9]

The U.S. Trustee alleges that in the months leading up to his financial collapse, Debtor liquidated large sums of cryptocurrency to spend on himself, although Debtor contests the "largeness" of those withdrawals, stating they totaled "less than $80,000." Regardless, Debtor admits that beginning in December 2017, he liquidated cryptocurrency from his accounts several times to cover personal expenses. Debtor admits to multiple withdrawals multiple times a month between December 22, 2017 and June 19, 2018, wherein Debtor withdrew cryptocurrency to make cash deposits at his bank account, most of which he used for personal expenses. Those withdrawals totaled just over $85,500 in about six months, and were used for things like a down payment on a car, Lasik surgery, clothing, hotel rooms and vacations, payments on credit cards and Debtor's Lending Club loan, and gambling, dinners, and drinks with friends.

At his deposition, Debtor insisted he never liquidated other people's cryptocurrency to obtain money for his own personal use. Debtor instead

---

[9] Debtor argues he did not admit "the veracity of the claims" made, but he admitted at his deposition that he owed the money in the judgments based on the claims stated.

claimed that whenever he cashed out some of the cryptocurrency, he would revise the proportional share spreadsheet to reduce his ownership percentage. That said, however, the last updated proportional share spreadsheet in the record is dated mid-April 2018; there is no document chronicling any fluctuations in any investor's share from that time forward, despite the fact that Debtor withdrew cryptocurrency for personal expenses through June 19, 2018.

Debtor emptied his cryptocurrency accounts for the final time on June 19, 2018, and filed a Chapter 7 bankruptcy petition less than a month later, on July 13, 2018. In his filing, Debtor listed total assets of $18,772.29 and total liabilities of $993,402.21. Debtor asserted in his petition that his debts are *not* primarily consumer debts. The bulk of Debtor's unsecured debt is owed to four of the cryptocurrency investors: $618,000 to Gus Hanger, $50,000 to Dennis Huber, $230,456 to Jackson Haney, and $30,000 to Ryan Kearns. Debtor's petition asserts that all four claims are disputed, although at his deposition, Debtor testified that he did not dispute that he owed the debts. Debtor did not list any claims on his bankruptcy filing of any other cryptocurrency "investors."

## II.     Debtor's Financial Records

The U.S. Trustee's memorandum in support of summary judgment is

supported by twenty two exhibits. Of these, the following relate to Debtor's cryptocurrency transactions:

- Exhibit 4. Email attachment of spreadsheet entitled "Crypto Returns 12/18/2017."
- Exhibit 5. Email attachment of undated proportional share spreadsheet.
- Exhibits 9 through 13. Emails to Hanger, Kearns, and Haney with attachments showing value of investments, which Debtor later admitted were inflated.
- Exhibit 16. Coinbase trade history (65 pages).
- Exhibit 17. Coinbase wallet (77 pages).
- Exhibit 18. Cryptopia trade history (28 pages).
- Exhibit 19. Bittrex trade history (152 pages).
- Exhibit 20. Gemini trade history (112 pages).
- Exhibit 21. GDAX transactional history (189 pages).

The transaction histories for the various cryptocurrency exchanges do not quantify profits, losses, or any changes to account balances. Rather, someone would need to go through the cryptocurrency records produced by Debtor and match up each transaction with the cryptocurrency valuation on the date of the transaction (which is not included in the documents) and compute the gain or loss on each transaction. This would involve examining the thousands of transactions at issue and matching them to the price of that particular form of cryptocurrency at that particular time. Debtor testified at his deposition that it would take him a very long time to do this sort of calculation, and he has not engaged an expert to do the accounting for him. Further, to calculate each investor's share of the gain or loss would require

additional labor.

The exhibits also include two documents regarding Debtor's gambling: Exhibit 14 (Bovada deposit and withdrawal history) and Exhibit 23 (spreadsheet of casino expenditures). The Bovada records show deposits, primarily in the form of bitcoin, of $172,653.38 from April 1 through May 30, 2018. The only withdrawal is $9500 on May 6, 2018. Regarding the social gambling Debtor did with friends, Debtor produced a transaction list to the Chapter 7 trustee detailing seven instances of gambling between April 30, 2018 and May 21, 2018, totaling $1441.93. This document reflects Debtor's cash withdrawals from his bank account at the casinos, however, and does not specify gains or losses from those cash withdrawals. As to Debtor's personal finances, Exhibit 15 is the Bank of America account statements for the months of December 2017 through July 2019.

When responding to the U.S. Trustee's motion, Debtor did not provide any additional financial documents.

## III.  Conclusions of Law

An adversary proceeding objecting to a debtor's discharge is a core proceeding under 28 U.S.C. § 157(b)(2)(J), over which this Court may exercise subject matter jurisdiction.[10]

---

[10]  This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of the United States District Court for the

Case 18-06072   Doc# 43   Filed 04/15/20   Page 11 of 23

## A.     Summary Judgment Standards

Federal Rule of Civil Procedure 56 requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] When analyzing a summary judgment motion, the Court draws all reasonable inferences in favor of the non-moving party.[12] An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[13] "Material facts" are those that are "essential to the proper disposition of [a] claim" under applicable law."[14] However, "an appraisal of the legal issues may lead a court to exercise its discretion and deny summary judgment in order to obtain the fuller factual foundation afforded by a plenary trial."[15]

---

District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy Judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order 13-1, *printed in* D. Kan. Rules of Practice and Procedure (March 2018).

[11] Rule 56 is incorporated and applied in bankruptcy courts under Federal Rule of Bankruptcy Procedure 7056.

[12] *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 34 (10th Cir. 2013).

[13] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[14] *Id.*

[15] 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d*, § 2728 at 415 (4th ed.) (citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249 (1948)).

The moving party bears the initial burden of demonstrating—by reference to pleadings, depositions, answers to interrogatories, admissions, or affidavits—the absence of genuine issues of material fact.[16] If the moving party meets its initial burden, the nonmoving party cannot prevail by relying solely on its pleadings.[17] "Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation."[18] Under this Court's Local Bankruptcy Rules, "[t]he court will deem admitted . . . all material facts contained in the statement of the movant unless the statement of the opposing party specifically controverts those facts."[19]

## B.    Section 727 Generally

Section 727 generally grants Chapter 7 debtors a discharge, "[h]owever, the expectation is that, to be entitled to discharge, the debtor must deal fairly with creditors and with the court. This obligation is imposed indirectly through a series of objections to discharge set out in Code § 727(a)."[20] The U.S. Trustee has alleged causes of action under §§ 727(a)(3) and 727(a)(5).

---

[16]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[17]  *United States v. Dawes*, 344 F. Supp. 2d 715, 717–18 (D. Kan. 2004) (citing *Anderson*, 477 U.S. at 256).

[18]  *Id.*

[19]  D. Kan. LBR 7056.1(a).

[20]  *Wieland v. Gordon (In re Gordon)*, 526 B.R. 376, 387–88 (10th Cir. BAP 2015) (internal quotation and alteration omitted).

The pertinent prohibited activities are:

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
> . . .
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

"At their core, § 727(a)(3) and (a)(5) are concerned about a lack of information that prevents trustees and creditors from meaningfully examining a debtor's financial affairs or tracing his assets."[21]

As the party objecting to Debtor's discharge, the U.S. Trustee bears the burden of proof to show the elements of § 727 are met by a preponderance of the evidence.[22] "The various discharge exceptions of § 727(a) are independent, and a plaintiff need only prove the elements of one exception by a preponderance of the evidence in order to obtain a denial of discharge."[23] The Court is cognizant that "the Bankruptcy Code must be construed liberally in

---

[21] *Hunt v. Steffensen (In re Steffensen)*, 534 B.R.180, 194 (Bankr. D. Utah 2015), *aff'd*, 567 B.R. 188 (D. Utah 2016).

[22] *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1156–57 (10th Cir. 1991).

[23] *In re Gordon*, 526 B.R. at 394.

favor of the debtor."[24]

## C.    Section 727(a)(3)

To state a prima facie case under § 727(a)(3), the U.S. Trustee must demonstrate that Debtor "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material business* transactions."[25] This requirement is further explained as follows:

> In this context, 'impossible' should not be read to require a plaintiff to exhaust all theoretical means to determine the debtor's financial condition. A party objecting to discharge need show only that it cannot ascertain the debtor's financial condition and recent business transactions *from the records provided.* It is not necessary to show that there is no conceivable way to ascertain the financial condition of the debtor.[26]

A debtor's records are insufficient if courts and creditors are required to speculate about the debtor's financial history or condition, and parties should "not be compelled to reconstruct the debtor's affairs."[27] If the U.S. Trustee meets this burden, then the burden shifts to Debtor "to justify his failure to

---

[24] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).
[25] *Id.* at 1295.
[26] *In re Steffensen*, 534 B.R. at 197 (internal quotation omitted).
[27] *In re Juzwiak*, 89 F.3d 424, 428 (7th Cir. 1996).

15

maintain the records."[28] "'The purpose of § 727(a)(3) is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs. This statute ensures that trustees and creditors will receive sufficient information to enable them to trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions.'"[29] The records should be sufficient for verification of the debtor's oral statements and explanation of his affairs.[30]

Debtor has stated that his debts are not primarily consumer debts. The existence of the three written contracts for the investment of substantial assets mandates this position. The Court agrees that when evaluating whether Debtor has satisfied the standard for record keeping relating to investments in cryptocurrency maintained it is appropriate to apply the standard applicable to a small business. Debtor agreed to provide investment services for family members and acquaintances. The written contracts between Debtor and Kearns, Haney, and Hanger each provided that Debtor need only remit back 95% to 98% of the profits as interest, thereby entitling Debtor to retain some profits as compensation for his services. In substance,

---

[28] *In re Brown*, 108 F.3d at 1295.
[29] *In re Steffensen*, 534 B.R. at 197 (quoting *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999)).
[30] *Sackett v. Shahid (In re Shahid)*, 334 B.R. 698, 707 (Bankr. N.D. Fla. 2005).

Debtor was engaging in the business of providing cryptocurrency investment services.

"The scope of the debtor's duty to maintain records depends on the nature of the debtor's business and the facts and circumstances of each case."[31] "The long-standing rule in the Tenth Circuit is that: 'Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them.'"[32] On the other hand, "[w]hen a debtor carries on a business involving substantial assets, 'greater and better record keeping' is warranted."[33] Debtor's business involved substantial assets; the single proportionate share spreadsheet contained in the record shows investments having a total value of $1,689,027 on behalf of seventeen individuals.

The U.S. Trustee contends that the business records produced by Debtor are insufficient. As he points out, there is no documentation from which the Court can verify the cryptocurrency deposits and withdrawals of

---

[31] *Martinez v. Sears (In re Sears)*, 565 B.R. 184, 189-90 (10th Cir. BAP 2017).

[32] *The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 615 (10th Cir. BAP 2001), *aff'd* 35 Fed. App'x 811 (10th Cir. 2002) (quoting *Hedges v. Bushnell*, 106 F.2d 979, 982 (10th Cir. 1939)).

[33] *In re Sears*, 565 B.R. at 190 (quoting *Canera v. Sun Cmtys. Operating Ltd. P'ship (In re Canera)*, 550 F,3d 755, 762 (9th Cir. 2008)).

the various investors. For example, the Court cannot verify Debtor's testimony that when he made cryptocurrency withdrawals to provide funds for personal expenses, he deducted the amount from his personal cryptocurrency account. Likewise, there is no document to verify Debtor's testimony that four of the investors began cashing out or withdrawing funds in April 2018 and that they cashed out less than their account values. The presence or absence of preferential transfers cannot be ascertained. There is no documentation stating the value of the various accounts at reasonable intervals. The record contains only one example of the proportionate share spreadsheet.

Debtor states he maintained these records on an ongoing basis, until several weeks before the accounts were closed. But while these spreadsheets were maintained, they were overwritten when updated, so these records are no longer available. The exhibits include what Debtor admits were false account statements provided to some investors, but the business records do not provide a way for those investors to determine the true value of their accounts on the dates of the false statements. The voluminous transaction histories from the cryptocurrency markets show thousands of transactions, but they do not purport to show the value of even the commingled assets,

much less the individual investments, on various dates. Likewise, Debtor's records of his online gambling, which was an aspect of his cryptocurrency investment business, are not complete. They consist of only deposit and withdrawal ledgers obtained from Bovada; there are no records showing the source of the deposits or the allocation of the deposits to the various individual accounts.

In response to the U.S. Trustee's motion for summary judgment, Debtor provides no additional financial records. Rather, he argues that the cryptocurrency trading records are sufficient and that the U.S. Trustee must have an expert to establish the inadequacy of the cryptocurrency accounts.

The Court finds that the summary judgment pleadings and exhibits do not provide a basis to determine if the records are sufficient or insufficient. It is clear that the records in their present form are inadequate to inform creditors, the U.S. Trustee, and the Court of the Debtor's financial transactions. They would be sufficient only if information about specific investments and trades can be reconstructed. But Debtor's testimony is the only evidence addressing what would be required to extract meaningful information from the bitcoin transaction records, and his testimony is both limited and conflicting. For example, in response to whether investors' losses

Case 18-06072   Doc# 43   Filed 04/15/20   Page 19 of 23

could be quantified from the bitcoin transaction histories, Debtor testified that it is possible, that he could not do so, but "maybe a professional" could. Debtor stated: "You would have to go through every transaction by this price on this date, how much that money was to sell. It would be tough because there's thousands of transactions, but I think it is possible that it could be done."[34] Later in the same deposition, Debtor testified that he could reconstruct the amounts that were lost but "it would take a very long time."[35] When responding to the Trustee's statement of facts, Debtor attempts to controvert this testimony that reconstruction would "take a very long time," by the following argument: "Assuming that an expert in cryptocurrency would use a computer program to take the cryptocurrency records that Reichmeier produced in native, excel format and associate those records with the cryptocurrency valuations of the applicable dates, it would take that expert mere seconds."[36]

One of the considerations when determining if records are sufficient is "the reasonableness of the records in light of customary practices among

---

[34] Exh. 1, p. 155, ll.15-25.
[35] *Id.* p. 160, ll.12-25.
[36] Doc. 30, p. 12.

20

individuals similarly situated to the debtor."[37] Here the Court has been provided no evidence concerning customary record-keeping practices when trading bitcoins, a business with which the Court is not familiar. Debtor testified that maybe a professional could reconstruct the transactions from the records provided, but there is no evidence of what expertise would be needed, how many hours of work would be required, or how much it would cost. In the particular circumstances of this case, expert opinion evidence may be necessary. Debtor was the sole person associated with his business, and therefore the only available fact witness, but he was unable to testify about the foregoing.

The Court therefore concludes that the U.S. Trustee has not satisfied his burden to establish that Debtor failed to keep sufficient records. The Court denies the U.S. Trustee's motion for summary judgment on the claim made under § 727(a)(3).

### D. Section 727(a)(5)

"Under § 727(a)(5), a bankruptcy court has broad power to decline to grant a discharge where the debtor does not adequately explain a shortage,

---

[37] 4 *Norton Bankruptcy Law & Practice 3d*, § 86:9 (William L. Norton III, ed.) (citing *Johnson v. Bockman*, 282 F.2d 544, 546 (10th Cir. 1960)).

Case 18-06072    Doc# 43    Filed 04/15/20    Page 21 of 23

loss, or disappearance of assets."[38] "Section 727(a)(5) requires a satisfactory

explanation which must consist of more than vague, indefinite and

uncorroborated assertions by the debtor."[39] "The United States Court of

Appeals for the Tenth Circuit has not set forth a standard for determining

what constitutes a 'satisfactory explanation' of loss of assets under §

727(a)(5). Other courts have determined that such a finding is left to the

sound discretion of the court."[40] Generally, "some corroboration of a debtor's

testimony as to the loss or disposition of assets" is necessary and

"explanations of a debtor's circumstances in general terms, that merely

suggest reasons for the loss of assets, fall short of the mark."[41]

Regarding losses based on gambling, courts have generally held that

"*unsubstantiated* gambling losses are a basis for a denial of discharge under §

727(a)(5)."[42]

---

[38] *Cobra Well Testers v. Carlson (In re Carlson)*, No. 06-8158, 2008 WL 8677441, at *5 (10th Cir. Jan. 23, 2008) (internal quotations and alterations omitted).

[39] *Id.*

[40] *Martinez v. Sears (In re Sears)*, 565 B.R. 184, 192 (10th Cir. BAP 2017).

[41] *Id.*, *see also* 6 *Collier on Bankruptcy* ¶ 727.08 at 727–45 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("A satisfactory explanation has not been definitively defined, but the debtor probably must explain the losses or deficiencies in such a manner as to convince the court of good faith and businesslike conduct. However, lack of wisdom in the debtor's expenditures, by itself, is not grounds for denial of discharge.").

[42] *Solomon v. Barman* (*In re Barman*), 244 B.R. 896, 901 (Bankr. E.D. Mich. 2000) (citing cases) (emphasis added).

22

The Court denies the U.S. Trustee's motion for summary judgment under § 727(a)(5) because the summary judgment pleadings provide an inadequate basis for exercise of the Court's discretion to deny discharge. The loss of assets is uncontroverted. It is true, as Debtor argues and as set forth in the Court's findings of uncontroverted facts, that Debtor has given a thorough explanation of what happened to those assets. But to avoid denial of discharge, the case law also requires that the explanation be corroborated. The problem is that the only source of corroboration of Debtor's explanation in the summary judgment pleadings is the Debtor's financial records, which are not transparent. Without additional evidence interpreting those records, the Court cannot determine whether Debtor's explanation of the loss of assets is corroborated.

## III.  Conclusion

The U.S. Trustee has not established that he is entitled to judgment on his claims under § 727(a)(3) and § 727(a)(5). The U.S. Trustee's motion for summary judgment is denied.

**It is so ordered**.

# # #